# Exhibit A

Fulton County Superior Court
***EFILED***LW
Date: 5/13/2022 10:45 AM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
### SUMMONS

**SAMUEL BOOKS, LLC**

) **Case**
) **No.:**       2022CV364850
)
)
**Plaintiff,**
)
)
**vs.**
)
**INFINITY BOOKS, INC, ET AL.**
)
)
**(\*ADDENDUM SHEET ATTACHED)**
)
**Defendant**
)
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

Jeffrey L. Mapen, Esq.
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street NW, Suite 1700, Atlanta, GA 30363
404-322-6000

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This    5/13/2022              day of              , 20

Honorable Cathelene "Tina" Robinson
Clerk of Superior Court
By

Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you              , 20

Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

2022CV364850

**<u>ADDITIONAL PARTIES</u>:**

PEPPER HOLDINGS, INC. F/K/A INFINITY BOOKS, INC.

JUSTIN ANDREW SORRELL

DENNIS SORRELL

JOSHUA KNIGHT

Fulton County Superior Court
***EFILED***LW
Date: 5/13/2022 10:45 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| SAMUEL BOOKS, LLC, | |
| Plaintiff, | Civil Action File No.: 2022CV364850 |
| v. | |
| INFINITY BOOKS, INC.; PEPPER HOLDINGS, INC. F/K/A INFINITY BOOKS, INC.; JUSTIN ANDREW SORRELL; DENNIS SORRELL; AND JOSHUA KNIGHT | **JURY TRIAL REQUESTED** |
| Defendants. | |

## **COMPLAINT**

Samuel Books, LLC ("Samuel Books") brings this action against Infinity Books, Inc. ("Infinity"), Pepper Holdings, Inc. (f/k/a Infinity Books, Inc.) ("Pepper Holdings"), Justin Andrew Sorrell ("J. Sorrell"), Dennis Sorrell ("D. Sorrell"), and Joshua Knight (collectively, "Defendants") for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, and fraudulent inducement arising from failure to perform under contracts arising from, and false statements made relating to, an asset purchase occurring March 31, 2021 (the "Acquisition"). Samuel Books respectfully alleges and shows the Court as follows:

## **INTRODUCTION**

1.      On April 1, 2021, Samuel Books, a subsidiary of Rittenhouse Media, LLC ("Rittenhouse"), paid Defendants several million dollars for what it reasonably believed, based on Defendants' express representations, was a sophisticated, finely tuned software platform from which Samuel Books could immediately begin to generate substantial profit buying and selling college textbooks online. To ensure a smooth transition as Samuel Books took over Infinity's business, Samuel Books also agreed to pay J. Sorrell and Knight thousands of dollars every month for "transition services," which would include training a successor and, until the successor was up-to-speed, addressing technical problems arising during the operation of the business.

2.      Defendants' promises and representations did not match reality. As key financial metrics of the business cratered following the Acquisition, it became apparent that key functions of the software that Samuel Books had paid millions of dollars for either did not work, or never existed. Put simply, Infinity's software—the core of its business—was a "lemon." Moreover, a year into providing "transition services" in exchange for tens of thousands of dollars, J. Sorrell and Knight had failed to adequately train or prepare anyone to take over their duties, thus ensuring themselves (or so they believed) a place on the company payroll in perpetuity.

3.      In summary, one year after the Acquisition, Defendants had received millions of dollars for nearly worthless software and wholly inadequate "transition services," and Samuel Books was left holding the bag.

4.      This outcome violates the terms of the Asset Purchase Agreement ("APA") entered between Samuel Books as purchaser, and Infinity, J. Sorrell, and D. Sorrell as sellers (collectively, the "APA Defendants") on March 31, 2021, and the Transition Services Agreement ("TSA") entered between Samuel Books and Infinity, J. Sorrel, and Knight (collectively, the "TSA Defendants"), also on March 31, 2021.

5.      The one-sided deal giving rise to this lawsuit resulted from numerous misrepresentations made by Defendants to induce Samuel Books to purchase Infinity's assets, including promises by J. Sorrell of a "sophisticated" software platform calibrated for "optimum profit per book," such that he did not "recommend fiddling with our settings," because they had allegedly "found that 'sweet spot' where the business is super easy to run but very profitable." None of that was true, and Defendants knew it, but they misrepresented the truth to induce Samuel Books to enter the Acquisition and pay them millions of dollars.

6.      As further alleged in this Complaint, Defendants have breached express and implied contractual obligations to Samuel Books. Moreover, Defendants' willful and knowing misrepresentations to induce the Acquisition constitute negligent

misrepresentation and fraudulent inducement. Samuel Books is entitled to recover the asset purchase price, sums paid for alleged "transition services," and other relief that the Court sees fit to award.

## PARTIES, JURISDICTION, VENUE, AND GOVERNING LAW

7.     Plaintiff Samuel Books, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 511 Feheley Dr., King of Prussia, Pennsylvania 19406.

8.     Defendant Infinity Books, Inc. is a corporation organized and existing under the laws of the State of Alabama with its principal place of business listed by the Alabama Secretary of State as 4003 Holmes Avenue NW, Huntsville, Alabama 35816. Infinity is no longer present at that location, and upon information and belief is operating from 607 Cambridge Circle, Muscle Shoals, Alabama, 35661. Infinity may be served with process at 1106 Authority St., Muscle Shoals, Alabama, 35661.

9.     Defendant Pepper Holdings, Inc., f/k/a Infinity Books, Inc., is a corporation organized and existing under the laws of the State of Alabama with its principal place of business listed by the Alabama Secretary of State as 4003 Holmes Avenue NW, Huntsville, Alabama 35816. Pepper Holdings is no longer present at that location, and upon information and belief is operating from 607 Cambridge Circle, Muscle Shoals, Alabama, 35661. Pepper Holdings may be served with process at 1106 Authority St., Muscle Shoals, Alabama, 35661.

10.    Defendant Justin Andrew Sorrell is an individual residing at 607 Cambridge Circle, Muscle Shoals, Alabama, 35661.

11.    Defendant Dennis Sorrell is an individual residing at 1106 Authority Street, Muscle Shoals, Alabama, 35661.

12.    Defendant Joshua Knight is an individual residing at 109 Miniver Place NW, Madison, Alabama, 35757.

13.    Jurisdiction and venue are proper in this Court as to all Defendants under the APA, TSA, and Georgia's long arm statute, O.C.G.A. § 9-10-91.

14.    Defendants J. Sorrell, D. Sorrell, Infinity, and Pepper Holdings (as the apparent successor to Infinity) consented to Samuel Books serving process of this lawsuit in accordance with the APA's Notice provisions. (APA § 9.2(b).)

15.    This dispute is governed by the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Law rules and provisions. (APA § 9.4; TSA § 3.8.)

## BACKGROUND

**I.    Rittenhouse Looks to Strengthen its Online Textbooks Sales by Acquiring an Established Online Textbook Seller.**

16.    Established in 1946, Rittenhouse is a leading distributor to college bookstores, libraries, and other businesses of print and electronic books, primarily in the fields of medicine, nursing, and health.

17.    Around 2020, Rittenhouse began searching for additional book businesses to compliment and expand its existing offerings. During this search, Rittenhouse became aware of Infinity, which was owned by J. Sorrell and D. Sorrell, and managed and operated by J. Sorrell and Knight.

18.    Infinity was in the business of buying and selling college textbooks. Each college semester, millions of college students around the United States look to sell textbooks for their completed coursework, and purchase textbooks for their new schedule of classes. College textbooks can cost hundreds of dollars, thus creating a large and potentially lucrative after-market for used books.

19.    Infinity conducted most of its business under the names "Infinity Books" and "Textbook Maniac" (sometimes shortened to "TBM"), operating primarily through the websites infinity-books.com and textbookmaniac.com. The core of Infinity's business, and key to its supposed success, was Infinity's proprietary suite of software, algorithms, and tools  (collectively, the "Infinity IP") that enabled the purchase and sale of books through multiple inbound and outbound

vendors (referred to herein as "referral sources") based on parameters set by the business, including desired profit margin. Rittenhouse was led to believe that Infinity's strong cash flow (reported as approximately $100,000 in profit per month), was the product of the allegedly innovative and effective Infinity IP.

20.     Key metrics of the Infinity IP's successful performance included:

- Total referrals to TBM from referral sources;

- Total books purchased from referral sources through the Infinity websites;

- Total value of books purchased from referral sources through the Infinity websites;

- Average price that Infinity paid for each book sold; and

- Profit margin for each book.

21.     Infinity's primary referral sources for textbooks are various online books sellers. Visitors to those websites enter the International Standard Book Number (ISBN) of the textbook they wish to sell or purchase, and are referred to TBM. These referrals are the source of TBM's pipeline of inventory, for which there is a ready market of buyers. Web traffic from referral sites is therefore critical to the success of the business.

22.   From the time the parties began exploring a potential acquisition, Defendants made unambiguous claims about their business and the technology that made it run.

23.   On October 13, 2020, when Rittenhouse asked as part of its due diligence why Infinity's sales were down 8.5 percent through August 2020, J. Sorrell responded that it was "because we no longer sell books with narrow profit margins" since changing profit margin settings in the Infinity IP. According to J. Sorrell:

> We currently have our buyback website settings to weed out any books we cannot make at least $10 on. Last year we were accepting $5 and $6 per book profits so we bought more books.

24.   J. Sorrell continued:

> We now have are [SIC] settings such that we only purchase the best and most profitable books with great sales ranks that will sell quickly. If y'all end up purchasing us we can show you all of the different settings our website has.  It's quite sophisticated.  You can play around with the settings to find your optimum profit per book at the optimum number of books purchased each day.  Of course, I wouldn't really recommend fiddling with our settings...we have played around with it for years to find the settings that we are currently at and they are obviously working. Our profit is through the roof. We believe we've finally found that "sweet spot" where the business is super easy to run but very profitable.

25.   Thus, to induce the Acquisition, Defendants represented that the technology not only worked, but operated at "optimum" efficiency, such that it was neither necessary nor advisable to "fiddle" with any of the settings. According to Defendants, this made their business "super easy to run" and "very profitable."

26.    In that same email, J. Sorrell attributed a surprising 41.6 percent drop in cost of goods sold (COGS) to a "correction" to the algorithm:

> This is 100% a result of our algorithm correction. Sounds too good to be true, right? Well, it isn't. . . . Notice that our average purchase price dropped by over $12 but the average sale price dropped by only $1.63!! We added over $10 a book to our margins in the last 12 months! Our net profit margin is currently $14 a book whereas it used to be down in the $2-$4 per book range when our algorithm was messed up.

According to J. Sorrell, the algorithm allowed Infinity to set its desired profit margin, contributing greatly to the company's profitability.

27.    Defendants' promises extended beyond software, as Defendants agreed to transfer ownership of Infinity's Amazon account, seller portal, email addresses, and associated bank accounts (the "Amazon Accounts") to Samuel Books as part of the Acquisition.

28.    Amazon Accounts are indispensable for an online seller like Samuel Books, and their transfer would be indispensable to maintain continuity of the business.

29.    The TSA Defendants also agreed to help personally transition Infinity's business to Samuel Books to ensure that the business would operate seamlessly under new ownership. Among other things, the TSA Defendants agreed to train permanent personnel and address technical concerns for the twelve months following the Acquisition.

## II.    The Parties Enter the Asset Purchase Agreement.

30.    Based on Defendants' representations that (A) its technology not only worked, but made the business "super easy to run but very profitable," (B) J. Sorrell and Knight would help transition the business to new ownership, and (C) Infinity would transfer its Amazon Accounts, Rittenhouse formed Samuel Books, which agreed to purchase "substantially all of the assets constituting, used or held for use in, or necessary for the operation of" Infinity's book sales and distribution business. (APA, second WHEREAS clause.)

31.    On March 31, 2021, Samuel Books entered the APA to purchase certain of Infinity's assets. Parties to the APA included Samuel Books as purchaser, Infinity as seller, and J. Sorrell and D. Sorrell as stockholders in Infinity.

32.    Among other assets, Samuel Books purchased from Infinity "all Intellectual Property owned by or licensed to [Infinity] and used or held for use primarily in the Business set forth on Schedule 1.1(c)." Schedule 1.1(c) lists the following:[1]

---

[1] *See* APA § 9.10(a)(i) (incorporating Schedules and Exhibits to the APA into the APA).

- book buying technology system and algorithm and related code
- Pricing Algorithm and Software
- Buyback Algorithm and Software
- Processing Tools
- trade names "Infinity Books" and "Textbook Mania"
- domain names and all website content, code and data on www.infinity-books.com and www.textbookmaniac.com, other than the Excluded IP

33.    The APA defines "Intellectual Property" to include, *inter alia*, "(iv) all trade secrets and confidential business information (including ideas, compositions, technical data, pricing and cost information, and business and marketing plans and proposals); and (v) Software and Technology." (APA § 1.1(c).)

34.    The APA defines "Software" as follows:

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flowcharts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

35.    The APA defines "Technology" as follows:

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, engineering, product specifications, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

36.    In exchange for Infinity's Intellectual Property, Software, and Technology, which included without limitation the algorithms and software code (*i.e.*, the Infinity IP) necessary to continue Infinity's book-buying business, Samuel Books compensated J. Sorrell and D. Sorrell as follows:

- Millions of dollars in cash at closing;

- Hundreds of thousands of dollars for purchase of inventory;

- A valuable membership interest in Samuel Books affiliate Rittenhouse Media, LLC;

- A secured promissory note in the amount of several hundred thousand dollars; and

- Earn-out payments equal to twenty percent of quarterly profits, with an option for a put option, call option, and buyout fee.

(the "Purchase Price"). (APA §§ 2.1-2.3.)

37.    As part of the sale, Sellers made certain representations and warranties. (*See* APA, Art. III.) Among other things, Sellers certified that no statement in any document furnished to Samuel Books "contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading." (APA § 3.21.)

38.    Sellers further warranted the "absence of certain developments," including that they had not "experienced any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect." (APA § 3.6(a).)

39.    The APA defines "Material Adverse Effect" as follows:

"Material Adverse Effect" means any change or effect that, individually or in the aggregate (i) is materially adverse to the business, condition (financial or otherwise), results of operations, prospects, properties or assets or Liabilities of Seller (including, specifically, the termination or cancellation, or other materially adverse alteration of its business relationship with the Business, of any customer or group of customers, of the Business representing revenues equal to or greater than 10% of the revenues of the Business (determined for the Business' 2019 fiscal year)), except for any change or effect that arises out of, results from or is attributable: to (A) any change in conditions in the global economy, or (B) any change in the economic or business conditions affecting the industries in which Seller conducts business (in each case that do not disproportionately affect Seller); or (ii) materially and adversely affects the ability of the Stockholders or Seller to consummate the transactions contemplated by this Agreement.

40.    Consistent with Defendants' promise to transfer and assign all Amazon Accounts, Schedule 1.1(a) of the APA provides that the Amazon Services Business Solutions Agreement ("Amazon Services Agreement") would be assigned from Infinity to Samuel Books. It was only "to the extent that the Amazon [Services Agreement] . . . cannot be sold, assigned, transferred, conveyed or delivered to the Purchaser after Closing" that the Seller was required to grant Purchaser an unlimited license to the benefits of the Amazon Accounts. (APA § 5.11.) The Amazon Services Agreement and Amazon Accounts were capable of being transferred.

41.    The APA also restricted Sellers' ability to compete against Samuel Books, providing that until five years after the closing date, "neither Seller nor any Stockholder will, directly or indirectly, for any reason, for its own benefit, or for the benefit of or together with any other Person, directly or indirectly"

(d)    except for the benefit of the Purchaser, be engaged as an executive officer, limited liability entity manager or director or in any other managerial or sales capacity or as an owner, co-owner, or other investor of or in, or lender to, whether as an employee, independent contractor, consultant or advisor, or sales representative or distributor of any kind, in any business of selling, reselling or distributing books in electronic or hard-copy mediums (or any business substitutable therefore) (the "**Restricted Business**") anywhere in the Prohibited Territory, with the parties acknowledging that Purchaser and its Affiliates are actively engaged in such business throughout and beyond all parts of the Prohibited Territory; provided, however, the foregoing prohibition on ownership shall not apply to ownership of less than one percent (1%) of the outstanding capital stock of any such Restricted Business that is publicly traded.

## III.    The Parties Enter the Transition Services Agreement.

42.    As part of the Acquisition, Samuel Books and Defendants J. Sorrell Joshua Knight entered into the TSA. (*See* APA §§ 6.2(e), 6.3(c); TSA, third WHEREAS clause.)

43.    J. Sorrell, Knight, and other employees "provided, or caused to be provided, certain administrative and business services to [Samuel Books] for the operation of [Samuel Books] and the Business." (TSA, second WHEREAS clause.) Through the TSA, J. Sorrell and Knight agreed to provide those administrative and business services "to ensure an orderly transition of the Business to [Samuel Books]." (TSA, third WHEREAS clause.)

44.    Under the TSA, the TSA Defendants were to "provide such information, advice and assistance concerning matters that are within the scope of [Infinity's, J. Sorrell, or Knight's] knowledge and expertise." (TSA § 1.1(a).) J. Sorrell and Knight were required to perform these services with the "same degree of care as if exercised in performing the same or similar services for [Infinity] prior to the Closing, but not less than reasonable care." (TSA § 1.2.)

45.    Absent a written extension agreement, the TSA lasted for one year. (TSA §§ 1.3, 1.4.) Samuel Books agreed to pay J. Sorrell and Knight thousands of dollars per month for the transition services. (TSA § 2.1.)

IV.    **With the Purchase Price Paid, Defendants Failed to Perform Under the APA or TSA.**

46.    Post-acquisition, Samuel Books materially underperformed financial expectations set by Defendants, with total books purchased through the textbookmaniac.com website (accounting for 80 percent of all books purchased company-wide) in 2021 down 45 percent, total value of books purchased through the textbookmaniac.com website down 33 percent, and the average price of each book purchased by Samuel Books up 22 percent, thereby reducing the gross margin by at least $4.86 per book. These factors contributed to a 34 percent drop in net sales from 2020 to 2021.

47.    Troublingly, Samuel Books learned after the Acquisition that Defendants' financial controls were lacking, leading to, among other things, Samuel Books discovering that Defendants' then-current controller had illegally and unlawfully funneled $39,606.96 from Infinity's PayPal account to his wife. The Huntsville, Alabama Police Department opened an investigation and charged the employee (who eventually paid back the stolen money), but Defendants professed to be completely unaware of the theft carried out at their former business. When Samuel Books discovered the identity of the recipient of the funds and disclosed that information to Defendants, J. Sorrell and Knight claimed they did not know who she was, despite her being a Facebook friend, and married to a longtime employee. Further, upon information and belief, J. Sorrell and Knight had attended the couple's

wedding. After the scheme was exposed, J. Sorrell and Knight disclosed that they had suspected the same employee of unlawful conduct a few years before.

48.    But the ultimate culprit for the severe financial underperformance was the very software and algorithms that Defendants had so confidently touted to induce Samuel Books to agree to the Acquisition. In short, Defendants' express representations about the Infinity IP were false. The harmful impact of these misrepresentations was exacerbated by Defendants' subsequent failure to transfer the Amazon Accounts, to provide transition services as promised under the TSA, or to honor their agreement not to compete against Samuel Books.

## A.    Defendants Misrepresented the Infinity IP's Capabilities.

49.    Shortly after the Acquisition, Samuel Books' referral volume (*i.e.*, the number of books purchased from referral sources) began to plummet—dropping over 80 percent by October 2021. The slide began in the months before the Acquisition (down 8 percent in January and 13 percent in February), but the Defendants attributed this to an outbreak of COVID-19 among Infinity employees. Increasingly dismal performance metrics in subsequent months demonstrate this excuse was not true.

50.    Post-Acquisition, Samuel Books discovered that referral volume dropped 45 percent in March (numbers were not available at the time of the March

31st Acquisition), and nose-dived from there, down 54 percent in June, 63 percent in July, 82 percent in October, and 81 percent in November.

51.    When the dust had settled, 2021 referral volume to the TBM website had plunged 51 percent from the previous year, from 194,886 to 94,584, resulting in a 45 percent decrease in books purchased through the TBM website, which was the core of the business.

52.    Yet at that same time, the volume of books purchased outside of the TBM website grew 62 percent, even though non-TBM website purchases used the same pricing engine as the TBM website. The price per book purchased through the TBM website rose 22 percent in 2021, while the price per book purchased outside of the TBM website rose just 0.1 percent during that same period. This difference in sales results between the TBM website and non-TBM website contradicts Defendants' contention that the algorithm treated referral sources the same as non-referral sources.

53.    Soon after the Acquisition, Samuel Books brought these snowballing business failures to the attention of Defendants, who deflected and claimed nothing was wrong with the Infinity IP, even though the version of the software code originally provided by Infinity could not be compiled or run, and the modified version that was capable of compilation was clearly in poor repair.

54.    It turns out that something was wrong, exposing as false one of Defendants' core representations about the technology they sold to Samuel Books.

55.    Specifically, to arrest the dropping referral volume, Knight was asked to change settings in the Settings Panel (the "Price Limit Settings") to increase the offering price to purchase more books. Knight made the change, but to everyone's surprise, nothing happened. That is because the pricing algorithm was *hardcoded to a certain formula*, rather than adjustable as J. Sorrell and Knight had claimed repeatedly—and quite specifically—when pitching representatives for Samuel Books on the Acquisition. Defendants' vaunted "settings," which they had allegedly "played around with for years," did not actually impact the price paid for books, which was a core promised feature of the software.

56.    Samuel Books instructed their part-time software programmer, Ryan Clordy, to remove the hardcoding and add the variables to the Settings Panel. This change improved the referrals from down 82 percent in October 2021, to only down 58 percent in December 2021. Unfortunately, this change also reduced the gross profit per book from $16.08 (December 1-14) to $9.98 (December 15-31).

57.    Knight then proposed changing a setting in the program that required a certain amount of gross margin to bid on a book. Samuel Books agreed to set a minimum profit of $2.00 per book. But 30 minutes after implementing this change, the data feed from Amazon timed out, meaning the minimum gross margin setting—

which was another key feature promoted by Defendants to induce Samuel Books to purchase Infinity—did not work. J. Sorrell's claim that it could "weed out any books" on which it could not make a certain margin was not true.

58.    Further attempting to diagnose the disappointing performance of the business, Defendants informed Samuel Books that its book offers were not competitive in the market, requiring them to raise their prices. This required increasing the Price Limit Settings. Samuel Books agreed to increase by 20 percent.

59.    But on December 11, 2021, after attempting to implement the requested increase, Knight wrote:

> So, the algorithm is a little more complicated than I remember. Andrew and I discussed this with Wayne Schroer a few months back, and we were under the impression that "Price Limit Percentage" was changing the [Referral Source X] limit. When I changed it on Tuesday, nothing really changed. I pulled pricing reports each day, and the prices were staying the same.
>
> When I was at the store with Andrew yesterday, I brought this up with him, and we started to dig through the settings and compare the generated prices to the generated "Price Limit Percentage." The numbers didn't add up.
>
> I pulled up the TBM [textbook maniac] code and traced what each setting was doing in the algorithm. Turns out, "Price Limit Percentage" IS setting the elasticity of the price, but NOT against [Referral Source X]. The "Price Limit Percentage" allows us to set the elasticity of the average amazon price. It has been a few years since we set this up, but it was designed to prevent us from overpaying for books in August and January when the prices spike.

60.     This email reveals that changing the Price Limit Percentage did not improve referral results from Samuel Books' top referral source ("Referral Source X"). This function was fundamental to the software suite promised by Defendants.

61.     Knight's December 11, 2021 email also shows that despite express claims to the contrary, the algorithm did not treat all referral sources the same. Other top referral sources, for example, were subjected to different settings than top wholesalers.

62.     In Q4 of 2021, Samuel Books' traffic with two primary referral sources was down 79 percent and 56 percent respectively. Samuel Books' shipments from these referral sites was down 46 percent and 56 percent respectively. Yet the number of books Samuel Books purchased from a wholesaler using the same pricing engine was up 17 percent. Samuel Books used that same algorithm with a new referrral source, and its purchases from that source have only increased since July 2021 when the relationship began.

63.     Other fundamental defects in the Infinity IP included hardcoding of critical internal logic affecting pricing of books.

64.     Further, comments left by developers in the code show a fundamental misunderstanding of the basic operating parameters of the code—at least as those parameters were explained to Samuel Books to induce purchase of the Infinity IP.

65.     The Infinity IP was missing key promised features, and did not perform as promised or reasonably expected. The flaws were fundamental, and obvious to Defendants, who were intimately familiar with the technology and its limitations.

**B.     Defendants failed and refused to transfer the Amazon Accounts.**

66.     Despite being bound by the APA to transfer, *inter alia*, the Amazon Accounts, J. Sorrell wrote on October 22, 2021 that due to an unrelated dispute involving the TSA, he "was not giving authorization for the Amazon account to be transferred to your account." It was not until December 7, 2021—nearly eight months after the APA was executed—that Defendants transferred the Amazon Accounts.

67.     Defendants justified this delay by leading Samuel Books to believe that Amazon Seller Central was not accessible from outside of the Huntsville, Alabama location and that Amazon would suspend the account if the company attempted to make it accessible outside that location. That turned out to be untrue—Samuel Books now accesses Seller Central from several locations around the US with no adverse consequences.

68.     As a result of that false information, Samuel Books did not have access to Seller Central outside of Huntsville for eight months post-Acquisition, which prevented Samuel Books from reviewing sales performance, price performance, optimizing the business using the Seller Central platform, or resolving issues with

Seller Central. Nor could Samuel Books change the bank account into which Seller Central deposited the net sales proceeds, or change the ownership of the account or the tax ID number associated with the account.

69.    Defendants' delay in granting access to the account for the site that accounted for 97 percent of sales revenue caused Samuel Books substantial loss.

### C.    Defendants failed and refused to provide reasonable transition services.

70.    Samuel Books paid J. Sorrell and Knight thousands of dollars per month for their transition services through the one-year term, which was not renewed. (TSA § 2.1.)

71.    During this one-year term, J. Sorrell and Knight failed to provide adequate transition services, including by failing to train or prepare another employee to take over the business at the conclusion of the one-year term, and failing to be reasonably present to address needs of the business.

72.    On March 22, 2022, with the one-year expiration just days away, J. Sorrell admitted in an email that the designated trainee, Adam Easterwood, was not "able to handle everything yet." J. Sorrell parlayed his failure to prepare Easterwood into a proposal that Samuel Books renew the TSA for another year, during which time he promised that Knight would "work[] with Ryan on reworking the algorithm to handle profit margin." Samuel Books responded:

We don't intend to extend the Transition Services Agreement, so it will expire on April 1. Given the current state of the business, and your failure to prepare Adam for this transition over the past 12 months or otherwise abide by the terms of the Transition Services Agreement, we think it would be futile to continue to try working together on this.

You've already been paid for 12 months to get Adam suitably trained. You haven't been in the office for at least two months and now you want more money to do something that should have been done a very long time ago. Why would we want to continue that?

73.     The TSA terminated automatically on April 1, 2022.

**D.     J. Sorrell and D. Sorrell competed against Samuel Books in violation of the APA.**

74.     J. Sorrell is a director and co-owner of Gold, Guns, and Guitars, Inc. ("GGG"), a pawn shop with locations in Florence, Alabama, and Madison, Alabama.

75.     For at least six months after the Acquisition, GGG's website (goldgunsandguitars.com) advertised "Textbook Buyback" as follows:



(Screen shot captured Sept. 23, 2021.)

76.     Following the Acquisition, GGG was engaged in the business of selling, reselling, or distributing books. At all relevant times, J. Sorrell was a director and co-owner of in the company.

77.     Upon information and belief, J. Sorrell and D. Sorrell have been involved in other companies post-Acquisition that have been in the business of selling, reselling, or distributing books.

## COUNT I
## Breach of Contract – Asset Purchase Agreement

78.     Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count One.

79.     The APA Defendants breached the terms of the APA by, *inter alia*, failing to deliver a functioning version of the software and algorithms forming the core of Infinity's online bookselling business. The Infinity IP constitutes Intellectual Property, Software, and Technology under the APA, all of which Samuel Books purchased outright through the APA.

80.     The Infinity IP did not function as promised at the time of the Acquisition. Alternatively, the Intellectual Property, Software, and Technology ceased to function as promised after the Acquisition through no fault of Samuel Books.

81.    The APA Defendants breached their representations and warranties under the APA by failing to disclose that the Infinity IP did not possess key features that they had originally promised, or required significant reprogramming, maintenance, upgrading, and remediation.

82.    The APA Defendants breached the APA by failing and refusing to transfer the Amazon Accounts to Samuel Books until December 7, 2021—eight months after the acquisition.

83.    The APA Defendants breached the APA by falsely certifying that they had made no false statements of material fact to Samuel Books, by commission or omission, when in fact the APA Defendants knew or should have known that the software and algorithm sold to Samuel Books did not work as they had promised, either because it had never worked, or due to failure or degradation.

84.    The APA Defendants further breached the APA by their involvement as directors, owners, or co-owners of companies (including without limitation GGG) "in any business of selling, reselling or distributing books in electronic or hard-copy mediums (or any business substitutable therefore)" within the "Prohibited Territory."

85.    By failing to deliver functioning Infinity IP, the APA Defendants further breached the APA's implied duty of good faith and fair dealing, which

required without limitation that the assets delivered by the APA Defendants worked in the manner reasonably anticipated, which they did not.

86.     Samuel Books performed under the APA, including by paying the Purchase Price due under Article II of the APA for the Intellectual Property, Software, and Technology, and transfer of the Amazon Accounts.

87.     The APA Defendants' breaches of the APA, and associated breaches of their duty of good faith and fair dealing, resulted in damages to Samuel Books to be proved at trial, but in an amount not less than the Purchase Price.

## COUNT II
## Breach of Contract – Transition Services Agreement

88.     Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Two.

89.     The TSA Defendants breached the terms of the TSA by, *inter alia*, failing to exercise reasonable care to transition Infinity's business to Samuel Books.

90.     The TSA Defendants admitted that following one year of allegedly providing transition services under the TSA, they had failed to train anyone to replace them in the operation of Samuel Books.

91.     By failing to exercise reasonable care to transition Infinity's business to Samuel Books, the APA Defendants further breached the TSA's implied duty of good faith and fair dealing, which required without limitation that the TSA

Defendants adequately train personnel in tasks necessary to run the business, which they did not.

92.    Samuel Books performed under the TSA, including by paying the full annual amount due under the TSA.

93.    The TSA Defendants' breaches of the TSA, and associated breaches of their duty of good faith and fair dealing, resulted in damages to Samuel Books in an amount to be proved at trial, but in an amount not less than the fee paid to the TSA Defendants under TSA.

## COUNT III
## Negligent Misrepresentation

94.    Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Three.

95.    Defendants negligently misrepresented, *inter alia*, the capabilities of the assets to be sold to Samuel Books, and the level of "transition services" they would supply following the acquisition.

96.    Defendants had a pecuniary duty to provide accurate information to Samuel Books concerning Infinity and the assets, including the Infinity IP.

97.    Defendants supplied false information to Samuel Books concerning the supposed capabilities of the assets purchased by Samuel Books.

98.    Defendants failed to exercise reasonable care in obtaining and communicating the false information to Samuel Books.

99.     Samuel Books justifiably relied on Defendants misrepresentations, and suffered pecuniary loss as a result, including loss of the Purchase Price.

## COUNT IV
## Fraudulent Inducement

100.    Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Four.

101.    Defendants made false representations of fact, including without limitation, that:

- the "business is super easy to run but very profitable" because the website was built on an algorithm that had been fine tuned to optimize profit;

- the Infinity IP included "settings" that had achieved a "sweet spot" of performance;

- the Infinity IP allowed the business to adjust settings to increase the offer price for books;

- the Infinity IP allowed the business to adjust settings to a minimum gross profit margin;

- the Infinity IP applied "settings" uniformly across referral sources;

- the Infinity IP and all of its promised features worked at the time of the Acquisition;

- the TSA Defendants would transition the business to Samuel Books through training and other assistance.

102. Defendants knew that the foregoing representations were false, or were at least recklessly indifferent to the truth, as evidenced by Defendants' familiarity with the Infinity IP for many years before the Acquisition.

103. Defendants made the false representations to induce Samuel Books to acquire Infinity's assets for millions of dollars.

104. Samuel Books justifiably relied on Defendants' false representations, and suffered damages as a result of its justifiable reliance, including loss of the purchase price.

## **PRAYER FOR RELIEF**

WHEREFORE, Samuel Books respectfully requests that an award be made and entered in its favor and against Defendants as follows:

A. Enter an award in favor of Samuel Books and against Defendants on all counts as alleged in this Complaint, including

1. Breach of the APA and implied covenant of good faith and fair dealing by the APA Defendants;

2. Breach of the TSA and implied covenant of good faith and fair dealing by the TSA Defendants;

3. Negligent misrepresentations by all Defendants;

4.      Fraudulent inducement by all Defendants.

B.      Award compensatory, actual, and contractual damages against Defendants in an amount to be determined at trial, but no less than the Purchase Price plus the fee paid to the TSA Defendants under the TSA Agreement;

C.      Award pre-judgment interest;

D.      Award Samuel Books attorneys' fees and reasonable expenses of litigation for Defendants unreasonable and stubborn litigiousness; and

E.      Grant Samuel Books such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Samuel Books demands a trial by jury on all questions of fact the Complaint raises.

This 9th day of May, 2022.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Jeffrey L. Mapen*
Jeffrey L. Mapen
Georgia Bar No. 469936
Peter L. Munk
Georgia Bar No. 451809
NELSON MULLINS RILEY &
SCARBOROUGH LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
404-322-6295
404-322-6050

jeff.mapen@nelsonmullins.com
peter.munk@nelsonmullins.com

*Attorneys for Plaintiff*

**General Civil and Domestic Relations Case Filing Information Form**

☒ **Superior** or ☐ **State Court of** _____ FULTON _____ **County**

| For Clerk Use Only | |
|---|---|
| **Date Filed** _____5/13/2022_____ <br> **MM-DD-YYYY** | **Case Number** __2022CV364850__ |

**Plaintiff(s)**

SAMUEL BOOKS, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**

INFINITY BOOKS, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

PEPPER HOLDINGS, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| SORRELL | JUSTIN | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| SORRELL | DENNIS | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** Jeffrey L. Mapen, Esq.    **State Bar Number** 469936    **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
**Case Number**                **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____    **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

**General Civil and Domestic Relations Case Filing Information Form**

☑ Superior or ☐ State Court of _____ FULTON _____ County

| For Clerk Use Only |
|---|
| Date Filed _____          Case Number _____ |
| MM-DD-YYYY |

**Plaintiff(s)**                                          **Defendant(s)**

SAMUEL BOOKS, LLC                                   KNIGHT          JOSHUA

Last      First      Middle I.   Suffix   Prefix     Last      First      Middle I.   Suffix   Prefix

Last      First      Middle I.   Suffix   Prefix     Last      First      Middle I.   Suffix   Prefix

Last      First      Middle I.   Suffix   Prefix     Last      First      Middle I.   Suffix   Prefix

Last      First      Middle I.   Suffix   Prefix     Last      First      Middle I.   Suffix   Prefix

**Plaintiff's Attorney** Jeffrey L. Mapen, Esq.       **State Bar Number** 469936       **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____              _____
**Case Number**                         **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAMUEL BOOKS, LLC,

        Plaintiff,

    v.

INFINITY BOOKS, INC.; PEPPER
HOLDINGS, INC. F/K/A INFINITY
BOOKS, INC.; JUSTIN ANDREW
SORRELL; DENNIS SORRELL; AND
JOSHUA KNIGHT

        Defendants.

Civil Action File No.: 2022CV364850

**JURY TRIAL REQUESTED**

## AFFIDAVIT OF SERVICE FOR DEFENDANTS INFINITY BOOKS, INC., PEPPER HOLDINGS, INC. F/K/A/ INFINITY BOOKS, INC., JUSTIN ANDREW SORRELL, AND DENNIS SORRELL

I, Peter L. Munk, certify that service of the Complaint, Case Initiation Form, and Summons was made on Defendants Infinity Books, Inc., Pepper Holdings, Inc. F/K/A/ Infinity Books, Inc., Justin Andrew Sorrell, and Dennis Sorrell, via FedEx on May 20, 2022 pursuant to Sections 9.2(b) and 9.5 of the Asset Purchase Agreement executed by the Parties on March 31, 2021, which provide in relevant part:

        (b)    Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 9.5</u>.

        **9.5**    **Notices.**  All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given: (a) if personally delivered, when so delivered; (b) if emailed, on the day the email was delivered, provided, that if such email was delivered after 5:00 p.m. EST, such email shall be deemed delivered as of

9:00 a.m. EST on the next succeeding Business Day; provided that overnight delivery pursuant to subpart (c) hereof must also accompany any notice delivered via email; or (c) if sent through a nationally-recognized overnight delivery service that guarantees next day delivery, the Business Day following its delivery to such service in time for next day delivery:

If to Seller to:                          with a copy to (which shall not constitute
                                          notice):
Infinity Books, Inc.
Attn: Justin Andrew Sorrell               James Irby
4003 Holmes Ave NW                        120 East Tenn. St.
Huntsville, AL 35816                      Florence, Alabama 35630
andrew.sorrell@infinity-books.com         james@jamesirby.com


If to Stockholders to:                    with a copy to (which shall not constitute
                                          notice):
Justin Andrew Sorrell
607 Cambridge Cir.                        James Irby
Muscle Shoals, AL 35661                   120 East Tenn. St.
jasorrell@comcast.net                     Florence, Alabama 35630
                                          james@jamesirby.com
Dennis Sorrell
1106 Authority St.
Muscle Shoals, AL 35661
dsor54@comcast.net

The notice letter and attachment dated May 19, 2022 is attached hereto as **Exhibit A**. The

May 20, 2022 delivery confirmations from FedEx are attached hereto as **Exhibit B**. These

communications and delivery methods satisfied the conditions of Sections 9.2(b) and 9.5 of the

Asset Purchase Agreement, thereby effecting valid service on Defendants Infinity Books, Inc.,

Pepper Holdings, Inc. F/K/A/ Infinity Books, Inc., Justin Andrew Sorrell, and Dennis Sorrell.

This 3rd day of June, 2022.

                              **NELSON MULLINS RILEY &
                              SCARBOROUGH LLP**

                              */s/ Peter L .Munk*
                              Peter L. Munk
                              Georgia Bar No. 451809
                              NELSON MULLINS RILEY
                               & SCARBOROUGH LLP
                              201 17th Street NW, Suite 1700
                              Atlanta, GA 30363
                              404-322-6295
                              404-322-6050
                              peter.munk@nelsonmullins.com

*Attorneys for Plaintiff*

# Exhibit A

| | |
|---|---|
| **From:** | Peter Munk |
| **Sent:** | Thursday, May 19, 2022 10:17 AM |
| **To:** | james@jamesirby.com |
| **Cc:** | Jeff Mapen; Silvi Shaw |
| **Subject:** | Samuel Books, LLC v. Infinity Books, Inc. et al. |
| **Attachments:** | 2022-05-13 Complaint (Samuel Books LLC v Infinity Books Inc.).pdf; 2022-05-13 Case Initiation Form (Samuel Books LLC v Infinity Books Inc.).pdf; 2022-05-13 Summons (Samuel Books LLC v Infinity Books Inc.).pdf |

Dear James:

This law firm represents Samuel Books, LLC.

I have attached the Complaint, Case Initiation Form, and Summons filed in the Superior Court of Fulton County, Georgia by Samuel Books, LLC against Infinity Books, Inc., Pepper Holdings, Inc., Justin Andrew Sorrell, Dennis Sorrell, and Joshua Knight.

Samuel Books, LLC is providing Notice of the Complaint under the Asset Purchase Agreement via overnight delivery to Seller (Pepper Holdings, Inc. f/k/a Infinity Books, Inc.) and Stockholders (J. Sorrell and D. Sorrell), with a copy to you, pursuant to Section 9.5(c), which will constitute valid service of process under Section 9.2(b).

Please let us know if you are authorized to accept service on behalf of Defendant Joshua Knight.

Thanks,

Peter



**NELSON MULLINS**

PETER L. MUNK   PARTNER
peter.munk@nelsonmullins.com
ATLANTIC STATION | SUITE 1700
201 17TH STREET NW | ATLANTA, GA 30363
T 404.322.6295   F 404.322.6050
NELSONMULLINS.COM   VCARD   VIEW BIO

Fulton County Superior Court
***EFILED***LW
Date: 5/13/2022 10:45 AM
Cathelene Robinson, Clerk

# IN THE SUPERIOR COURT OF FULTON COUNTY, GEORGIA
### 136 PRYOR STREET, ROOM C-103, ATLANTA, GEORGIA 30303
## SUMMONS

**SAMUEL BOOKS, LLC**

) Case
) No.:                          2022CV364850
)
)
)
**Plaintiff,**                  )
)
**vs.**                         )
**INFINITY BOOKS, INC, ET AL.** )
)
**(*ADDENDUM SHEET ATTACHED)**  )
**Defendant**                   )
)
)
)
)

TO THE ABOVE NAMED DEFENDANT(S):

You are hereby summoned and required to file electronically with the Clerk of said Court at
https://efilega.tylerhost.net/ofsweb (unless you are exempt from filing electronically) and serve upon
plaintiff's attorney, whose name and address is:

Jeffrey L. Mapen, Esq.
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street NW, Suite 1700, Atlanta, GA 30363
404-322-6000

An answer to the complaint which is herewith served upon you, within 30 days after service of this
summons upon you, exclusive of the day of service; unless proof of service of this complaint is not filed
within five (5) business days of such service. Then time to answer shall not commence until such proof of
service has been filed. **IF YOU FAIL TO DO SO, JUDGMENT BY DEFAULT WILL BE TAKEN
AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

This          5/13/2022          day of               , 20 

                                        Honorable Cathelene "Tina" Robinson
                                        Clerk of Superior Court
                                        By                          Deputy Clerk

To defendant upon whom this petition is served:
This copy of complaint and summons was served upon you               , 20

                                        Deputy Sherriff

**Instructions: Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum is used**

2022CV364850

**<u>ADDITIONAL PARTIES</u>:**

PEPPER HOLDINGS, INC. F/K/A INFINITY BOOKS, INC.

JUSTIN ANDREW SORRELL

DENNIS SORRELL

JOSHUA KNIGHT

Fulton County Superior Court
***EFILED***LW
Date: 5/13/2022 10:45 AM
Cathelene Robinson, Clerk

**General Civil and Domestic Relations Case Filing Information Form**

☑ **Superior** or ☐ **State Court of** _____FULTON_____ **County**

| For Clerk Use Only | |
|---|---|
| Date Filed __5/13/2022__ <br> **MM-DD-YYYY** | Case Number __2022CV364850__ |

### Plaintiff(s)

SAMUEL BOOKS, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

### Defendant(s)

INFINITY BOOKS, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

PEPPER HOLDINGS, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| SORRELL | JUSTIN | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| SORRELL | DENNIS | | | |

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney** __Jeffrey L. Mapen, Esq.__   **State Bar Number** __469936__   **Self-Represented** ☐

### Check one case type and one sub-type in the same box (if a sub-type applies):

**General Civil Cases**

- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**

- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
**Case Number**                    **Case Number**

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

**General Civil and Domestic Relations Case Filing Information Form**

☑ Superior or ☐ State Court of _____FULTON_____ County

| For Clerk Use Only |
|---|
| Date Filed _____    Case Number _____ |
| **MM-DD-YYYY** |

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| SAMUEL BOOKS, LLC | | | | | KNIGHT | JOSHUA | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

Plaintiff's Attorney  Jeffrey L. Mapen, Esq.    State Bar Number 469936    Self-Represented ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____    _____
Case Number            Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

Fulton County Superior Court
***EFILED***LW
Date: 5/13/2022 10:45 AM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

SAMUEL BOOKS, LLC,

        Plaintiff,

  v.

INFINITY BOOKS, INC.; PEPPER
HOLDINGS, INC. F/K/A INFINITY
BOOKS, INC.; JUSTIN ANDREW
SORRELL; DENNIS SORRELL;
AND JOSHUA KNIGHT

        Defendants.

Civil Action File No.:   2022CV364850

**JURY TRIAL REQUESTED**

### **COMPLAINT**

Samuel Books, LLC ("Samuel Books") brings this action against Infinity

Books, Inc. ("Infinity"), Pepper Holdings, Inc. (f/k/a Infinity Books, Inc.) ("Pepper

Holdings"), Justin Andrew Sorrell ("J. Sorrell"), Dennis Sorrell ("D. Sorrell"), and

Joshua Knight (collectively, "Defendants") for breach of contract, breach of the

implied covenant of good faith and fair dealing, negligent misrepresentation, and

fraudulent inducement arising from failure to perform under contracts arising from,

and false statements made relating to, an asset purchase occurring March 31, 2021

(the "Acquisition"). Samuel Books respectfully alleges and shows the Court as

follows:

## INTRODUCTION

1.    On April 1, 2021, Samuel Books, a subsidiary of Rittenhouse Media, LLC ("Rittenhouse"), paid Defendants several million dollars for what it reasonably believed, based on Defendants' express representations, was a sophisticated, finely tuned software platform from which Samuel Books could immediately begin to generate substantial profit buying and selling college textbooks online. To ensure a smooth transition as Samuel Books took over Infinity's business, Samuel Books also agreed to pay J. Sorrell and Knight thousands of dollars every month for "transition services," which would include training a successor and, until the successor was up-to-speed, addressing technical problems arising during the operation of the business.

2.    Defendants' promises and representations did not match reality. As key financial metrics of the business cratered following the Acquisition, it became apparent that key functions of the software that Samuel Books had paid millions of dollars for either did not work, or never existed. Put simply, Infinity's software—the core of its business—was a "lemon." Moreover, a year into providing "transition services" in exchange for tens of thousands of dollars, J. Sorrell and Knight had failed to adequately train or prepare anyone to take over their duties, thus ensuring themselves (or so they believed) a place on the company payroll in perpetuity.

3.     In summary, one year after the Acquisition, Defendants had received millions of dollars for nearly worthless software and wholly inadequate "transition services," and Samuel Books was left holding the bag.

4.     This outcome violates the terms of the Asset Purchase Agreement ("APA") entered between Samuel Books as purchaser, and Infinity, J. Sorrell, and D. Sorrell as sellers (collectively, the "APA Defendants") on March 31, 2021, and the Transition Services Agreement ("TSA") entered between Samuel Books and Infinity, J. Sorrel, and Knight (collectively, the "TSA Defendants"), also on March 31, 2021.

5.     The one-sided deal giving rise to this lawsuit resulted from numerous misrepresentations made by Defendants to induce Samuel Books to purchase Infinity's assets, including promises by J. Sorrell of a "sophisticated" software platform calibrated for "optimum profit per book," such that he did not "recommend fiddling with our settings," because they had allegedly "found that 'sweet spot' where the business is super easy to run but very profitable." None of that was true, and Defendants knew it, but they misrepresented the truth to induce Samuel Books to enter the Acquisition and pay them millions of dollars.

6.     As further alleged in this Complaint, Defendants have breached express and implied contractual obligations to Samuel Books. Moreover, Defendants' willful and knowing misrepresentations to induce the Acquisition constitute negligent

misrepresentation       and       fraudulent       inducement.       Samuel

Books is entitled to recover the asset purchase price, sums paid for alleged

"transition services," and other relief that the Court sees fit to award.

## PARTIES, JURISDICTION, VENUE, AND GOVERNING LAW

7.     Plaintiff Samuel Books, LLC is a limited liability company organized

and existing under the laws of the State of Delaware with its principal place of

business at 511 Feheley Dr., King of Prussia, Pennsylvania 19406.

8.     Defendant Infinity Books, Inc. is a corporation organized and existing

under the laws of the State of Alabama with its principal place of business listed by

the Alabama Secretary of State as 4003 Holmes Avenue NW, Huntsville, Alabama

35816. Infinity is no longer present at that location, and upon information and belief

is operating from 607 Cambridge Circle, Muscle Shoals, Alabama, 35661. Infinity

may be served with process at 1106 Authority St., Muscle Shoals, Alabama, 35661.

9.     Defendant Pepper Holdings, Inc., f/k/a Infinity Books, Inc., is a

corporation organized and existing under the laws of the State of Alabama with its

principal place of business listed by the Alabama Secretary of State as 4003 Holmes

Avenue NW, Huntsville, Alabama 35816. Pepper Holdings is no longer present at

that location, and upon information and belief is operating from 607 Cambridge

Circle, Muscle Shoals, Alabama, 35661. Pepper Holdings may be served with

process at 1106 Authority St., Muscle Shoals, Alabama, 35661.

10.    Defendant Justin Andrew Sorrell is an individual residing at 607 Cambridge Circle, Muscle Shoals, Alabama, 35661.

11.    Defendant Dennis Sorrell is an individual residing at 1106 Authority Street, Muscle Shoals, Alabama, 35661.

12.    Defendant Joshua Knight is an individual residing at 109 Miniver Place NW, Madison, Alabama, 35757.

13.    Jurisdiction and venue are proper in this Court as to all Defendants under the APA, TSA, and Georgia's long arm statute, O.C.G.A. § 9-10-91.

14.    Defendants J. Sorrell, D. Sorrell, Infinity, and Pepper Holdings (as the apparent successor to Infinity) consented to Samuel Books serving process of this lawsuit in accordance with the APA's Notice provisions. (APA § 9.2(b).)

15.    This dispute is governed by the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Law rules and provisions. (APA § 9.4; TSA § 3.8.)

## BACKGROUND

I.    **Rittenhouse Looks to Strengthen its Online Textbooks Sales by Acquiring an Established Online Textbook Seller.**

16.    Established in 1946, Rittenhouse is a leading distributor to college bookstores, libraries, and other businesses of print and electronic books, primarily in the fields of medicine, nursing, and health.

17.    Around 2020, Rittenhouse began searching for additional book businesses to compliment and expand its existing offerings. During this search, Rittenhouse became aware of Infinity, which was owned by J. Sorrell and D. Sorrell, and managed and operated by J. Sorrell and Knight.

18.    Infinity was in the business of buying and selling college textbooks. Each college semester, millions of college students around the United States look to sell textbooks for their completed coursework, and purchase textbooks for their new schedule of classes. College textbooks can cost hundreds of dollars, thus creating a large and potentially lucrative after-market for used books.

19.    Infinity conducted most of its business under the names "Infinity Books" and "Textbook Maniac" (sometimes shortened to "TBM"), operating primarily through the websites infinity-books.com and textbookmaniac.com. The core of Infinity's business, and key to its supposed success, was Infinity's proprietary suite of software, algorithms, and tools  (collectively, the "Infinity IP") that enabled the purchase and sale of books through multiple inbound and outbound

vendors (referred to herein as "referral sources") based on parameters set by the business, including desired profit margin. Rittenhouse was led to believe that Infinity's strong cash flow (reported as approximately $100,000 in profit per month), was the product of the allegedly innovative and effective Infinity IP.

20.    Key metrics of the Infinity IP's successful performance included:

- Total referrals to TBM from referral sources;

- Total books purchased from referral sources through the Infinity websites;

- Total value of books purchased from referral sources through the Infinity websites;

- Average price that Infinity paid for each book sold; and

- Profit margin for each book.

21.    Infinity's primary referral sources for textbooks are various online books sellers. Visitors to those websites enter the International Standard Book Number (ISBN) of the textbook they wish to sell or purchase, and are referred to TBM. These referrals are the source of TBM's pipeline of inventory, for which there is a ready market of buyers. Web traffic from referral sites is therefore critical to the success of the business.

22. From the time the parties began exploring a potential acquisition, Defendants made unambiguous claims about their business and the technology that made it run.

23. On October 13, 2020, when Rittenhouse asked as part of its due diligence why Infinity's sales were down 8.5 percent through August 2020, J. Sorrell responded that it was "because we no longer sell books with narrow profit margins" since changing profit margin settings in the Infinity IP. According to J. Sorrell:

> We currently have our buyback website settings to weed out any books we cannot make at least $10 on. Last year we were accepting $5 and $6 per book profits so we bought more books.

24. J. Sorrell continued:

> We now have are [SIC] settings such that we only purchase the best and most profitable books with great sales ranks that will sell quickly. If y'all end up purchasing us we can show you all of the different settings our website has. It's quite sophisticated. You can play around with the settings to find your optimum profit per book at the optimum number of books purchased each day. Of course, I wouldn't really recommend fiddling with our settings...we have played around with it for years to find the settings that we are currently at and they are obviously working. Our profit is through the roof. We believe we've finally found that "sweet spot" where the business is super easy to run but very profitable.

25. Thus, to induce the Acquisition, Defendants represented that the technology not only worked, but operated at "optimum" efficiency, such that it was neither necessary nor advisable to "fiddle" with any of the settings. According to Defendants, this made their business "super easy to run" and "very profitable."

26.     In that same email, J. Sorrell attributed a surprising 41.6 percent drop in cost of goods sold (COGS) to a "correction" to the algorithm:

> This is 100% a result of our algorithm correction. Sounds too good to be true, right? Well, it isn't. . . . Notice that our average purchase price dropped by over $12 but the average sale price dropped by only $1.63!! We added over $10 a book to our margins in the last 12 months! Our net profit margin is currently $14 a book whereas it used to be down in the $2-$4 per book range when our algorithm was messed up.

According to J. Sorrell, the algorithm allowed Infinity to set its desired profit margin, contributing greatly to the company's profitability.

27.     Defendants' promises extended beyond software, as Defendants agreed to transfer ownership of Infinity's Amazon account, seller portal, email addresses, and associated bank accounts (the "Amazon Accounts") to Samuel Books as part of the Acquisition.

28.     Amazon Accounts are indispensable for an online seller like Samuel Books, and their transfer would be indispensable to maintain continuity of the business.

29.     The TSA Defendants also agreed to help personally transition Infinity's business to Samuel Books to ensure that the business would operate seamlessly under new ownership. Among other things, the TSA Defendants agreed to train permanent personnel and address technical concerns for the twelve months following the Acquisition.

## II.    The Parties Enter the Asset Purchase Agreement.

30.    Based on Defendants' representations that (A) its technology not only worked, but made the business "super easy to run but very profitable," (B) J. Sorrell and Knight would help transition the business to new ownership, and (C) Infinity would transfer its Amazon Accounts, Rittenhouse formed Samuel Books, which agreed to purchase "substantially all of the assets constituting, used or held for use in, or necessary for the operation of" Infinity's book sales and distribution business. (APA, second WHEREAS clause.)

31.    On March 31, 2021, Samuel Books entered the APA to purchase certain of Infinity's assets. Parties to the APA included Samuel Books as purchaser, Infinity as seller, and J. Sorrell and D. Sorrell as stockholders in Infinity.

32.    Among other assets, Samuel Books purchased from Infinity "all Intellectual Property owned by or licensed to [Infinity] and used or held for use primarily in the Business set forth on <u>Schedule 1.1(c)</u>." Schedule 1.1(c) lists the following:[1]

---

[1] *See* APA § 9.10(a)(i) (incorporating Schedules and Exhibits to the APA into the APA).

- book buying technology system and algorithm and related code
- Pricing Algorithm and Software
- Buyback Algorithm and Software
- Processing Tools
- trade names "Infinity Books" and "Textbook Mania"
- domain names and all website content, code and data on www.infinity-books.com and www.textbookmaniac.com, other than the Excluded IP

33.  The APA defines "Intellectual Property" to include, *inter alia*, "(iv) all trade secrets and confidential business information (including ideas, compositions, technical data, pricing and cost information, and business and marketing plans and proposals); and (v) Software and Technology." (APA § 1.1(c).)

34.  The APA defines "Software" as follows:

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flowcharts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing.

35.  The APA defines "Technology" as follows:

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, engineering, product specifications, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

36.  In exchange for Infinity's Intellectual Property, Software, and Technology, which included without limitation the algorithms and software code (*i.e.*, the Infinity IP) necessary to continue Infinity's book-buying business, Samuel Books compensated J. Sorrell and D. Sorrell as follows:

- Millions of dollars in cash at closing;

- Hundreds of thousands of dollars for purchase of inventory;

- A valuable membership interest in Samuel Books affiliate Rittenhouse Media, LLC;

- A secured promissory note in the amount of several hundred thousand dollars; and

- Earn-out payments equal to twenty percent of quarterly profits, with an option for a put option, call option, and buyout fee.

(the "Purchase Price"). (APA §§ 2.1-2.3.)

37.    As part of the sale, Sellers made certain representations and warranties. (*See* APA, Art. III.) Among other things, Sellers certified that no statement in any document furnished to Samuel Books "contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading." (APA § 3.21.)

38.    Sellers further warranted the "absence of certain developments," including that they had not "experienced any event, occurrence or development that has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect." (APA § 3.6(a).)

39.    The APA defines "Material Adverse Effect" as follows:

"Material Adverse Effect" means any change or effect that, individually or in the aggregate (i) is materially adverse to the business, condition (financial or otherwise), results of operations, prospects, properties or assets or Liabilities of Seller (including, specifically, the termination or cancellation, or other materially adverse alteration of its business relationship with the Business, of any customer or group of customers, of the Business representing revenues equal to or greater than 10% of the revenues of the Business (determined for the Business' 2019 fiscal year)), except for any change or effect that arises out of, results from or is attributable: to (A) any change in conditions in the global economy, or (B) any change in the economic or business conditions affecting the industries in which Seller conducts business (in each case that do not disproportionately affect Seller); or (ii) materially and adversely affects the ability of the Stockholders or Seller to consummate the transactions contemplated by this Agreement.

40.    Consistent with Defendants' promise to transfer and assign all Amazon Accounts, Schedule 1.1(a) of the APA provides that the Amazon Services Business Solutions Agreement ("Amazon Services Agreement") would be assigned from Infinity to Samuel Books. It was only "to the extent that the Amazon [Services Agreement] . . . cannot be sold, assigned, transferred, conveyed or delivered to the Purchaser after Closing" that the Seller was required to grant Purchaser an unlimited license to the benefits of the Amazon Accounts. (APA § 5.11.) The Amazon Services Agreement and Amazon Accounts were capable of being transferred.

41.    The APA also restricted Sellers' ability to compete against Samuel Books, providing that until five years after the closing date, "neither Seller nor any Stockholder will, directly or indirectly, for any reason, for its own benefit, or for the benefit of or together with any other Person, directly or indirectly"

(d)    except for the benefit of the Purchaser, be engaged as an executive officer, limited liability entity manager or director or in any other managerial or sales capacity or as an owner, co-owner, or other investor of or in, or lender to, whether as an employee, independent contractor, consultant or advisor, or sales representative or distributor of any kind, in any business of selling, reselling or distributing books in electronic or hard-copy mediums (or any business substitutable therefore) (the "Restricted Business") anywhere in the Prohibited Territory, with the parties acknowledging that Purchaser and its Affiliates are actively engaged in such business throughout and beyond all parts of the Prohibited Territory; provided, however, the foregoing prohibition on ownership shall not apply to ownership of less than one percent (1%) of the outstanding capital stock of any such Restricted Business that is publicly traded.

### III.   The Parties Enter the Transition Services Agreement.

42.   As part of the Acquisition, Samuel Books and Defendants J. Sorrell Joshua Knight entered into the TSA. (*See* APA §§ 6.2(e), 6.3(c); TSA, third WHEREAS clause.)

43.   J. Sorrell, Knight, and other employees "provided, or caused to be provided, certain administrative and business services to [Samuel Books] for the operation of [Samuel Books] and the Business." (TSA, second WHEREAS clause.) Through the TSA, J. Sorrell and Knight agreed to provide those administrative and business services "to ensure an orderly transition of the Business to [Samuel Books]." (TSA, third WHEREAS clause.)

44.   Under the TSA, the TSA Defendants were to "provide such information, advice and assistance concerning matters that are within the scope of [Infinity's, J. Sorrell, or Knight's] knowledge and expertise." (TSA § 1.1(a).) J. Sorrell and Knight were required to perform these services with the "same degree of care as if exercised in performing the same or similar services for [Infinity] prior to the Closing, but not less than reasonable care." (TSA § 1.2.)

45.   Absent a written extension agreement, the TSA lasted for one year. (TSA §§ 1.3, 1.4.) Samuel Books agreed to pay J. Sorrell and Knight thousands of dollars per month for the transition services. (TSA § 2.1.)

## IV.    With the Purchase Price Paid, Defendants Failed to Perform Under the APA or TSA.

46.     Post-acquisition, Samuel Books materially underperformed financial expectations set by Defendants, with total books purchased through the textbookmaniac.com website (accounting for 80 percent of all books purchased company-wide) in 2021 down 45 percent, total value of books purchased through the textbookmaniac.com website down 33 percent, and the average price of each book purchased by Samuel Books up 22 percent, thereby reducing the gross margin by at least $4.86 per book. These factors contributed to a 34 percent drop in net sales from 2020 to 2021.

47.     Troublingly, Samuel Books learned after the Acquisition that Defendants' financial controls were lacking, leading to, among other things, Samuel Books discovering that Defendants' then-current controller had illegally and unlawfully funneled $39,606.96 from Infinity's PayPal account to his wife. The Huntsville, Alabama Police Department opened an investigation and charged the employee (who eventually paid back the stolen money), but Defendants professed to be completely unaware of the theft carried out at their former business. When Samuel Books discovered the identity of the recipient of the funds and disclosed that information to Defendants, J. Sorrell and Knight claimed they did not know who she was, despite her being a Facebook friend, and married to a longtime employee. Further, upon information and belief, J. Sorrell and Knight had attended the couple's

wedding. After the scheme was exposed, J. Sorrell and Knight disclosed that they had suspected the same employee of unlawful conduct a few years before.

48.    But the ultimate culprit for the severe financial underperformance was the very software and algorithms that Defendants had so confidently touted to induce Samuel Books to agree to the Acquisition. In short, Defendants' express representations about the Infinity IP were false. The harmful impact of these misrepresentations was exacerbated by Defendants' subsequent failure to transfer the Amazon Accounts, to provide transition services as promised under the TSA, or to honor their agreement not to compete against Samuel Books.

### A.    Defendants Misrepresented the Infinity IP's Capabilities.

49.    Shortly after the Acquisition, Samuel Books' referral volume (*i.e.*, the number of books purchased from referral sources) began to plummet—dropping over 80 percent by October 2021. The slide began in the months before the Acquisition (down 8 percent in January and 13 percent in February), but the Defendants attributed this to an outbreak of COVID-19 among Infinity employees. Increasingly dismal performance metrics in subsequent months demonstrate this excuse was not true.

50.    Post-Acquisition, Samuel Books discovered that referral volume dropped 45 percent in March (numbers were not available at the time of the March

31st Acquisition), and nose-dived from there, down 54 percent in June, 63 percent in July, 82 percent in October, and 81 percent in November.

51.     When the dust had settled, 2021 referral volume to the TBM website had plunged 51 percent from the previous year, from 194,886 to 94,584, resulting in a 45 percent decrease in books purchased through the TBM website, which was the core of the business.

52.     Yet at that same time, the volume of books purchased outside of the TBM website grew 62 percent, even though non-TBM website purchases used the same pricing engine as the TBM website. The price per book purchased through the TBM website rose 22 percent in 2021, while the price per book purchased outside of the TBM website rose just 0.1 percent during that same period. This difference in sales results between the TBM website and non-TBM website contradicts Defendants' contention that the algorithm treated referral sources the same as non-referral sources.

53.     Soon after the Acquisition, Samuel Books brought these snowballing business failures to the attention of Defendants, who deflected and claimed nothing was wrong with the Infinity IP, even though the version of the software code originally provided by Infinity could not be compiled or run, and the modified version that was capable of compilation was clearly in poor repair.

54.     It turns out that something was wrong, exposing as false one of Defendants' core representations about the technology they sold to Samuel Books.

55.     Specifically, to arrest the dropping referral volume, Knight was asked to change settings in the Settings Panel (the "Price Limit Settings") to increase the offering price to purchase more books. Knight made the change, but to everyone's surprise, nothing happened. That is because the pricing algorithm was *hardcoded to a certain formula*, rather than adjustable as J. Sorrell and Knight had claimed repeatedly—and quite specifically—when pitching representatives for Samuel Books on the Acquisition. Defendants' vaunted "settings," which they had allegedly "played around with for years," did not actually impact the price paid for books, which was a core promised feature of the software.

56.     Samuel Books instructed their part-time software programmer, Ryan Clordy, to remove the hardcoding and add the variables to the Settings Panel. This change improved the referrals from down 82 percent in October 2021, to only down 58 percent in December 2021. Unfortunately, this change also reduced the gross profit per book from $16.08 (December 1-14) to $9.98 (December 15-31).

57.     Knight then proposed changing a setting in the program that required a certain amount of gross margin to bid on a book. Samuel Books agreed to set a minimum profit of $2.00 per book. But 30 minutes after implementing this change, the data feed from Amazon timed out, meaning the minimum gross margin setting—

which was another key feature promoted by Defendants to induce Samuel Books to purchase Infinity—did not work. J. Sorrell's claim that it could "weed out any books" on which it could not make a certain margin was not true.

58.    Further attempting to diagnose the disappointing performance of the business, Defendants informed Samuel Books that its book offers were not competitive in the market, requiring them to raise their prices. This required increasing the Price Limit Settings. Samuel Books agreed to increase by 20 percent.

59.    But on December 11, 2021, after attempting to implement the requested increase, Knight wrote:

> So, the algorithm is a little more complicated than I remember. Andrew and I discussed this with Wayne Schroer a few months back, and we were under the impression that "Price Limit Percentage" was changing the [Referral Source X] limit. When I changed it on Tuesday, nothing really changed. I pulled pricing reports each day, and the prices were staying the same.
>
> When I was at the store with Andrew yesterday, I brought this up with him, and we started to dig through the settings and compare the generated prices to the generated "Price Limit Percentage." The numbers didn't add up.
>
> I pulled up the TBM [textbook maniac] code and traced what each setting was doing in the algorithm. Turns out, "Price Limit Percentage" IS setting the elasticity of the price, but NOT against [Referral Source X]. The "Price Limit Percentage" allows us to set the elasticity of the average amazon price. It has been a few years since we set this up, but it was designed to prevent us from overpaying for books in August and January when the prices spike.

60.     This email reveals that changing the Price Limit Percentage did not improve referral results from Samuel Books' top referral source ("Referral Source X"). This function was fundamental to the software suite promised by Defendants.

61.     Knight's December 11, 2021 email also shows that despite express claims to the contrary, the algorithm did not treat all referral sources the same. Other top referral sources, for example, were subjected to different settings than top wholesalers.

62.     In Q4 of 2021, Samuel Books' traffic with two primary referral sources was down 79 percent and 56 percent respectively. Samuel Books' shipments from these referral sites was down 46 percent and 56 percent respectively. Yet the number of books Samuel Books purchased from a wholesaler using the same pricing engine was up 17 percent. Samuel Books used that same algorithm with a new referrral source, and its purchases from that source have only increased since July 2021 when the relationship began.

63.     Other fundamental defects in the Infinity IP included hardcoding of critical internal logic affecting pricing of books.

64.     Further, comments left by developers in the code show a fundamental misunderstanding of the basic operating parameters of the code—at least as those parameters were explained to Samuel Books to induce purchase of the Infinity IP.

65.    The Infinity IP was missing key promised features, and did not perform as promised or reasonably expected. The flaws were fundamental, and obvious to Defendants, who were intimately familiar with the technology and its limitations.

**B.    Defendants failed and refused to transfer the Amazon Accounts.**

66.    Despite being bound by the APA to transfer, *inter alia*, the Amazon Accounts, J. Sorrell wrote on October 22, 2021 that due to an unrelated dispute involving the TSA, he "was not giving authorization for the Amazon account to be transferred to your account." It was not until December 7, 2021—nearly eight months after the APA was executed—that Defendants transferred the Amazon Accounts.

67.    Defendants justified this delay by leading Samuel Books to believe that Amazon Seller Central was not accessible from outside of the Huntsville, Alabama location and that Amazon would suspend the account if the company attempted to make it accessible outside that location. That turned out to be untrue—Samuel Books now accesses Seller Central from several locations around the US with no adverse consequences.

68.    As a result of that false information, Samuel Books did not have access to Seller Central outside of Huntsville for eight months post-Acquisition, which prevented Samuel Books from reviewing sales performance, price performance, optimizing the business using the Seller Central platform, or resolving issues with

Seller Central. Nor could Samuel Books change the bank account into which Seller Central deposited the net sales proceeds, or change the ownership of the account or the tax ID number associated with the account.

69.    Defendants' delay in granting access to the account for the site that accounted for 97 percent of sales revenue caused Samuel Books substantial loss.

**C.    Defendants failed and refused to provide reasonable transition services.**

70.    Samuel Books paid J. Sorrell and Knight thousands of dollars per month for their transition services through the one-year term, which was not renewed. (TSA § 2.1.)

71.    During this one-year term, J. Sorrell and Knight failed to provide adequate transition services, including by failing to train or prepare another employee to take over the business at the conclusion of the one-year term, and failing to be reasonably present to address needs of the business.

72.    On March 22, 2022, with the one-year expiration just days away, J. Sorrell admitted in an email that the designated trainee, Adam Easterwood, was not "able to handle everything yet." J. Sorrell parlayed his failure to prepare Easterwood into a proposal that Samuel Books renew the TSA for another year, during which time he promised that Knight would "work[] with Ryan on reworking the algorithm to handle profit margin." Samuel Books responded:

We don't intend to extend the Transition Services Agreement, so it will expire on April 1. Given the current state of the business, and your failure to prepare Adam for this transition over the past 12 months or otherwise abide by the terms of the Transition Services Agreement, we think it would be futile to continue to try working together on this.

You've already been paid for 12 months to get Adam suitably trained. You haven't been in the office for at least two months and now you want more money to do something that should have been done a very long time ago. Why would we want to continue that?

73.    The TSA terminated automatically on April 1, 2022.

**D.    J. Sorrell and D. Sorrell competed against Samuel Books in violation of the APA.**

74.    J. Sorrell is a director and co-owner of Gold, Guns, and Guitars, Inc. ("GGG"), a pawn shop with locations in Florence, Alabama, and Madison, Alabama.

75.    For at least six months after the Acquisition, GGG's website (goldgunsandguitars.com) advertised "Textbook Buyback" as follows:



(Screen shot captured Sept. 23, 2021.)

76.     Following the Acquisition, GGG was engaged in the business of selling, reselling, or distributing books. At all relevant times, J. Sorrell was a director and co-owner of in the company.

77.     Upon information and belief, J. Sorrell and D. Sorrell have been involved in other companies post-Acquisition that have been in the business of selling, reselling, or distributing books.

## COUNT I
## Breach of Contract – Asset Purchase Agreement

78.     Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count One.

79.     The APA Defendants breached the terms of the APA by, *inter alia*, failing to deliver a functioning version of the software and algorithms forming the core of Infinity's online bookselling business. The Infinity IP constitutes Intellectual Property, Software, and Technology under the APA, all of which Samuel Books purchased outright through the APA.

80.     The Infinity IP did not function as promised at the time of the Acquisition. Alternatively, the Intellectual Property, Software, and Technology ceased to function as promised after the Acquisition through no fault of Samuel Books.

81.    The APA Defendants breached their representations and warranties under the APA by failing to disclose that the Infinity IP did not possess key features that they had originally promised, or required significant reprogramming, maintenance, upgrading, and remediation.

82.    The APA Defendants breached the APA by failing and refusing to transfer the Amazon Accounts to Samuel Books until December 7, 2021—eight months after the acquisition.

83.    The APA Defendants breached the APA by falsely certifying that they had made no false statements of material fact to Samuel Books, by commission or omission, when in fact the APA Defendants knew or should have known that the software and algorithm sold to Samuel Books did not work as they had promised, either because it had never worked, or due to failure or degradation.

84.    The APA Defendants further breached the APA by their involvement as directors, owners, or co-owners of companies (including without limitation GGG) "in any business of selling, reselling or distributing books in electronic or hard-copy mediums (or any business substitutable therefore)" within the "Prohibited Territory."

85.    By failing to deliver functioning Infinity IP, the APA Defendants further breached the APA's implied duty of good faith and fair dealing, which

required without limitation that the assets delivered by the APA Defendants worked in the manner reasonably anticipated, which they did not.

86.    Samuel Books performed under the APA, including by paying the Purchase Price due under Article II of the APA for the Intellectual Property, Software, and Technology, and transfer of the Amazon Accounts.

87.    The APA Defendants' breaches of the APA, and associated breaches of their duty of good faith and fair dealing, resulted in damages to Samuel Books to be proved at trial, but in an amount not less than the Purchase Price.

## COUNT II
### Breach of Contract – Transition Services Agreement

88.    Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Two.

89.    The TSA Defendants breached the terms of the TSA by, *inter alia*, failing to exercise reasonable care to transition Infinity's business to Samuel Books.

90.    The TSA Defendants admitted that following one year of allegedly providing transition services under the TSA, they had failed to train anyone to replace them in the operation of Samuel Books.

91.    By failing to exercise reasonable care to transition Infinity's business to Samuel Books, the APA Defendants further breached the TSA's implied duty of good faith and fair dealing, which required without limitation that the TSA

Defendants adequately train personnel in tasks necessary to run the business, which they did not.

92.    Samuel Books performed under the TSA, including by paying the full annual amount due under the TSA.

93.    The TSA Defendants' breaches of the TSA, and associated breaches of their duty of good faith and fair dealing, resulted in damages to Samuel Books in an amount to be proved at trial, but in an amount not less than the fee paid to the TSA Defendants under TSA.

## COUNT III
### Negligent Misrepresentation

94.    Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Three.

95.    Defendants negligently misrepresented, *inter alia*, the capabilities of the assets to be sold to Samuel Books, and the level of "transition services" they would supply following the acquisition.

96.    Defendants had a pecuniary duty to provide accurate information to Samuel Books concerning Infinity and the assets, including the Infinity IP.

97.    Defendants supplied false information to Samuel Books concerning the supposed capabilities of the assets purchased by Samuel Books.

98.    Defendants failed to exercise reasonable care in obtaining and communicating the false information to Samuel Books.

99.    Samuel Books justifiably relied on Defendants misrepresentations, and suffered pecuniary loss as a result, including loss of the Purchase Price.

## COUNT IV
## Fraudulent Inducement

100.    Samuel Books incorporates the foregoing allegations as if fully re-alleged and restated in Count Four.

101.    Defendants made false representations of fact, including without limitation, that:

- the "business is super easy to run but very profitable" because the website was built on an algorithm that had been fine tuned to optimize profit;

- the Infinity IP included "settings" that had achieved a "sweet spot" of performance;

- the Infinity IP allowed the business to adjust settings to increase the offer price for books;

- the Infinity IP allowed the business to adjust settings to a minimum gross profit margin;

- the Infinity IP applied "settings" uniformly across referral sources;

- the Infinity IP and all of its promised features worked at the time of the Acquisition;

- the TSA Defendants would transition the business to Samuel Books through training and other assistance.

102.   Defendants knew that the foregoing representations were false, or were at least recklessly indifferent to the truth, as evidenced by Defendants' familiarity with the Infinity IP for many years before the Acquisition.

103.   Defendants made the false representations to induce Samuel Books to acquire Infinity's assets for millions of dollars.

104.   Samuel Books justifiably relied on Defendants' false representations, and suffered damages as a result of its justifiable reliance, including loss of the purchase price.

## **PRAYER FOR RELIEF**

WHEREFORE, Samuel Books respectfully requests that an award be made and entered in its favor and against Defendants as follows:

A.    Enter an award in favor of Samuel Books and against Defendants on all counts as alleged in this Complaint, including

1.    Breach of the APA and implied covenant of good faith and fair dealing by the APA Defendants;

2.    Breach of the TSA and implied covenant of good faith and fair dealing by the TSA Defendants;

3.    Negligent misrepresentations by all Defendants;

4.      Fraudulent inducement by all Defendants.

B.      Award compensatory, actual, and contractual damages against Defendants in an amount to be determined at trial, but no less than the Purchase Price plus the fee paid to the TSA Defendants under the TSA Agreement;

C.      Award pre-judgment interest;

D.      Award Samuel Books attorneys' fees and reasonable expenses of litigation for Defendants unreasonable and stubborn litigiousness; and

E.      Grant Samuel Books such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Samuel Books demands a trial by jury on all questions of fact the Complaint raises.

This 9th day of May, 2022.

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Jeffrey L. Mapen*
Jeffrey L. Mapen
Georgia Bar No. 469936
Peter L. Munk
Georgia Bar No. 451809
NELSON MULLINS RILEY & SCARBOROUGH LLP
201 17th Street NW, Suite 1700
Atlanta, GA 30363
404-322-6295
404-322-6050

jeff.mapen@nelsonmullins.com
peter.munk@nelsonmullins.com

*Attorneys for Plaintiff*

     

*package id*
0460643
*ship date*
Thu, May 19 2022
*to*
Justin Andrew Sorrell
Infinity Books
607 CAMBRIDGE CIR
MUSCLE SHOALS, AL
35661-3649
United States
404.322.6292
*residential address*
No
*return label*
No
*notification type*
Delivery
*notification recipients*
silvi.shaw@nelsonmul...

*from*
Peter Munk (PM8)
Nelson Mullins
Atlantic Station
201 17th Street NW, Suite
1700
Atlanta, GA   30363
US
(404) 322-6295
*billing*
client id: 062802.matter id :
09001
(062802.09001)
*operator*
Silvi   Shaw
(404) 322-6292
silvi.shaw@nelsonmullins.c
om
*create time*
05/19/22, 12:29PM

*vendor*
FedEx
*tracking number*
273326387639
*service*
FedEx Priority Overnight®
*packaging*
FedEx® Envelope
*courtesy quote*
19.31

*Quote may not reflect all
accessorial charges*

 

*package id*
  0460644
*ship date*
  Thu, May 19 2022
*to*
  Justin Andrew Sorrell
  Pepper Holdings, Inc.
  607 CAMBRIDGE CIR
  MUSCLE SHOALS, AL
    35661-3649
  United States
  404.322.6292
*residential address*
  No
*return label*
  No
*notification type*
  Delivery
*notification recipients*
  silvi.shaw@nelsonmul...

*from*
  Peter Munk (PM8)
  Nelson Mullins
  Atlantic Station
  201 17th Street NW, Suite
    1700
  Atlanta, GA  30363
  US
  (404) 322-6295
*billing*
  Rittenhouse Acquisition,
    LLC.Infinity Books
  (062802.09001)
*operator*
  Silvi  Shaw
  (404) 322-6292
  silvi.shaw@nelsonmullins.c
    om
*create time*
  05/19/22, 12:31PM

*vendor*
  FedEx
*tracking number*
  273326495960
*service*
  FedEx Priority Overnight®
*packaging*
  FedEx® Envelope
*courtesy quote*
  19.31

  *Quote may not reflect all
  accessorial charges*

 

*package id*
0460645

*ship date*
Thu, May 19 2022

*to*
Justin Andrew Sorrell
607 CAMBRIDGE CIR
MUSCLE SHOALS, AL
35661-3649
United States
404.322.6292

*residential address*
No

*return label*
No

*notification type*
Delivery

*notification recipients*
silvi.shaw@nelsonmul...

*from*
Peter Munk  (PM8)
Nelson Mullins
Atlantic Station
201 17th Street NW, Suite
1700
Atlanta, GA   30363
US
(404) 322-6295

*billing*
client id: 062802.matter id :
09001
(062802.09001)

*operator*
Silvi   Shaw
(404) 322-6292
silvi.shaw@nelsonmullins.c
om

*create time*
05/19/22, 12:32PM

*vendor*
FedEx

*tracking number*
273326575284

*service*
FedEx Priority Overnight®

*packaging*
FedEx® Envelope

*courtesy quote*
19.31

*Quote may not reflect all
accessorial charges*

 

*package id*
0460646

*ship date*
Thu, May 19 2022

*to*
Dennis   Sorrell
1106 AUTHORITY AVE
MUSCLE SHOALS, AL
   35661-1910
United States
404.322.6292

*residential address*
No

*return label*
No

*notification type*
Delivery

*notification recipients*
silvi.shaw@nelsonmul...

*from*
Peter  Munk  (PM8)
Nelson Mullins
Atlantic Station
201 17th Street NW, Suite
   1700
Atlanta, GA   30363
US
(404) 322-6295

*billing*
client id: 062802.matter id :
   09001
(062802.09001)

*operator*
Silvi   Shaw
(404) 322-6292
silvi.shaw@nelsonmullins.c
   om

*create time*
05/19/22, 12:34PM

*vendor*
FedEx

*tracking number*
273326656590

*service*
FedEx Priority Overnight®

*packaging*
FedEx® Envelope

*courtesy quote*
19.31

*Quote may not reflect all*
*accessorial charges*



**package id**
0460647

**ship date**
Thu, May 19 2022

**to**
James  Irby
120 E TENNESSEE ST
FLORENCE, AL  35630-
5623
United States
404.322.6292

**residential address**
No

**return label**
No

**notification type**
Delivery

**notification recipients**
silvi.shaw@nelsonmul...

**from**
Peter  Munk  (PM8)
Nelson Mullins
Atlantic Station
201 17th Street NW, Suite
1700
Atlanta, GA  30363
US
(404) 322-6295

**billing**
client id: 062802. matter id :
09001
(062802.09001)

**operator**
Silvi  Shaw
(404) 322-6292
silvi.shaw@nelsonmullins.c
om

**create time**
05/19/22, 12:35PM

**vendor**
FedEx

**tracking number**
273326738469

**service**
FedEx Priority Overnight®

**packaging**
FedEx® Envelope

**courtesy quote**
19.31

*Quote may not reflect all
accessorial charges*

# Exhibit B

**From:** TrackingUpdates@fedex.com
**Sent:** Friday, May 20, 2022 12:27 PM
**To:** silvi.shaw@nelsonmullins.com
**Subject:** FedEx Shipment 273326656590: Your package has been delivered

◄**External Email**► - From: bounce@nds.fedex.com



# Hi. Your package was delivered Fri, 05/20/2022 at 11:26am.

Delivered to 1106 AUTHORITY AVE, MUSCLE SHOALS, AL 35661

**OBTAIN PROOF OF DELIVERY**

---

## Personal Message

PSShip eMail Notification

---

| | |
|---|---|
| **TRACKING NUMBER** | 273326656590 |
| **FROM** | Nelson Mullins |
| | Atlantic Station |

1

201 17th Street NW, Suite 1700

Atlanta, GA, US, 30363

| | |
|---|---|
| **TO** | Dennis Sorrell |
| | 1106 AUTHORITY AVE |
| | MUSCLE SHOALS, AL, US, 35661 |
| **REFERENCE** | 062802.09001-PM8- |
| **SHIPPER REFERENCE** | 062802.09001-PM8- |
| **SHIP DATE** | Thu 5/19/2022 06:20 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Atlanta, GA, US, 30363 |
| **DESTINATION** | MUSCLE SHOALS, AL, US, 35661 |
| **SPECIAL HANDLING** | Deliver Weekday |
| | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Get the FedEx® Mobile app

Create shipments, receive tracking alerts, redirect packages to a FedEx retail location for pickup, and more from the palm of your hand
- **Download now**.



2

This tracking update has been requested by:

|  |  |
|---|---|
| **Company name:** | Nelson Mullins |
| **Name:** | Peter Munk |
| **Email:** | peter.munk@nelsonmullins.com |

---

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:26 AM CDT 05/20/2022.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2022 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, May 20, 2022 11:40 AM |
| **To:** | silvi.shaw@nelsonmullins.com |
| **Subject:** | FedEx Shipment 273326738469: Your package has been delivered |

◀**External Email**▶ - From: bounce@nds.fedex.com



# Hi. Your package was delivered Fri, 05/20/2022 at 10:38am.



Delivered to 120 E TENNESSEE ST, FLORENCE, AL 35630
Received by D.LOPEZ

**OBTAIN PROOF OF DELIVERY**

---

## Personal Message

PSShip eMail Notification

---

**TRACKING NUMBER**      273326738469

**FROM**      Nelson Mullins
Atlantic Station

201 17th Street NW, Suite 1700

Atlanta, GA, US, 30363

| | |
|---|---|
| **TO** | James Irby |
| | 120 E TENNESSEE ST |
| | FLORENCE, AL, US, 35630 |
| **REFERENCE** | 062802.09001-PM8- |
| **SHIPPER REFERENCE** | 062802.09001-PM8- |
| **SHIP DATE** | Thu 5/19/2022 06:20 PM |
| **DELIVERED TO** | Receptionist/Front Desk |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Atlanta, GA, US, 30363 |
| **DESTINATION** | FLORENCE, AL, US, 35630 |
| **SPECIAL HANDLING** | Deliver Weekday |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Get the FedEx® Mobile app

Create shipments, receive tracking alerts, redirect packages to a FedEx retail location for pickup, and more from the palm of your hand
- **Download now**.



This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Nelson Mullins |
| **Name:** | Peter Munk |
| **Email:** | peter.munk@nelsonmullins.com |

---

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 10:39 AM CDT 05/20/2022.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2022 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**From:**                TrackingUpdates@fedex.com
**Sent:**                Friday, May 20, 2022 10:06 AM
**To:**                  silvi.shaw@nelsonmullins.com
**Subject:**             FedEx Shipment 273326387639: Your package has been delivered

◄**External Email**► - From: bounce@nds.fedex.com



# Hi. Your package was delivered Fri, 05/20/2022 at 9:05am.



Delivered to 607 CAMBRIDGE CIR, MUSCLE SHOALS, AL 35661

**OBTAIN PROOF OF DELIVERY**

---

## Personal Message

PSShip eMail Notification

---

**TRACKING NUMBER**      273326387639

**FROM**                 Nelson Mullins
                         Atlantic Station

1

201 17th Street NW, Suite 1700

Atlanta, GA, US, 30363

**TO**    Infinity Books

Justin Andrew Sorrell

607 CAMBRIDGE CIR

MUSCLE SHOALS, AL, US, 35661

| | |
|---|---|
| **REFERENCE** | 062802.09001-PM8- |
| **SHIPPER REFERENCE** | 062802.09001-PM8- |
| **SHIP DATE** | Thu 5/19/2022 06:20 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Atlanta, GA, US, 30363 |
| **DESTINATION** | MUSCLE SHOALS, AL, US, 35661 |
| **SPECIAL HANDLING** | Deliver Weekday |
| | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Get the FedEx® Mobile app

Create shipments, receive tracking alerts, redirect packages to a FedEx retail location for pickup, and more from the palm of your hand - **Download now**.



2

This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Nelson Mullins |
| **Name:** | Peter Munk |
| **Email:** | peter.munk@nelsonmullins.com |

---

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 9:06 AM CDT 05/20/2022.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2022 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

**From:**          TrackingUpdates@fedex.com
**Sent:**          Friday, May 20, 2022 10:06 AM
**To:**            silvi.shaw@nelsonmullins.com
**Subject:**       FedEx Shipment 273326495960: Your package has been delivered

◀**External Email**▶ - From: bounce@nds.fedex.com



# Hi. Your package was delivered Fri, 05/20/2022 at 9:05am.



Delivered to 607 CAMBRIDGE CIR, MUSCLE SHOALS, AL 35661

**OBTAIN PROOF OF DELIVERY**

---

## Personal Message

PSShip eMail Notification

---

**TRACKING NUMBER**    273326495960

**FROM**    Nelson Mullins

Atlantic Station

201 17th Street NW, Suite 1700

Atlanta, GA, US, 30363

| | |
|---|---|
| **TO** | Pepper Holdings, Inc. |
| | Justin Andrew Sorrell |
| | 607 CAMBRIDGE CIR |
| | MUSCLE SHOALS, AL, US, 35661 |
| **REFERENCE** | 062802.09001-PM8- |
| **SHIPPER REFERENCE** | 062802.09001-PM8- |
| **SHIP DATE** | Thu 5/19/2022 06:20 PM |
| **DELIVERED TO** | Residence |
| **PACKAGING TYPE** | FedEx Envelope |
| **ORIGIN** | Atlanta, GA, US, 30363 |
| **DESTINATION** | MUSCLE SHOALS, AL, US, 35661 |
| **SPECIAL HANDLING** | Deliver Weekday |
| | Residential Delivery |
| **NUMBER OF PIECES** | 1 |
| **TOTAL SHIPMENT WEIGHT** | 0.50 LB |
| **SERVICE TYPE** | FedEx Priority Overnight |



# Get the FedEx® Mobile app

Create shipments, receive tracking alerts, redirect packages to a FedEx retail location for pickup, and more from the palm of your hand - **Download now**.



This tracking update has been requested by:

| | |
|---|---|
| **Company name:** | Nelson Mullins |
| **Name:** | Peter Munk |
| **Email:** | peter.munk@nelsonmullins.com |

---

**FOLLOW FEDEX**

     

✉  Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 9:06 AM CDT 05/20/2022.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2022 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.

| | |
|---|---|
| **From:** | TrackingUpdates@fedex.com |
| **Sent:** | Friday, May 20, 2022 10:06 AM |
| **To:** | silvi.shaw@nelsonmullins.com |
| **Subject:** | FedEx Shipment 273326575284: Your package has been delivered |

**◄External Email►** - From: bounce@nds.fedex.com



# Hi. Your package was delivered Fri, 05/20/2022 at 9:05am.



Delivered to 607 CAMBRIDGE CIR, MUSCLE SHOALS, AL 35661

**OBTAIN PROOF OF DELIVERY**

---

## Personal Message

PSShip eMail Notification

---

| | |
|---|---|
| **TRACKING NUMBER** | 273326575284 |
| **FROM** | Nelson Mullins |
| | Atlantic Station |

201 17th Street NW, Suite 1700

Atlanta, GA, US, 30363

**TO** Justin Andrew Sorrell

607 CAMBRIDGE CIR

MUSCLE SHOALS, AL, US, 35661

**REFERENCE** 062802.09001-PM8-

**SHIPPER REFERENCE** 062802.09001-PM8-

**SHIP DATE** Thu 5/19/2022 06:20 PM

**DELIVERED TO** Residence

**PACKAGING TYPE** FedEx Envelope

**ORIGIN** Atlanta, GA, US, 30363

**DESTINATION** MUSCLE SHOALS, AL, US, 35661

**SPECIAL HANDLING** Deliver Weekday

Residential Delivery

**NUMBER OF PIECES** 1

**TOTAL SHIPMENT WEIGHT** 0.50 LB

**SERVICE TYPE** FedEx Priority Overnight



# Get the FedEx® Mobile app

Create shipments, receive tracking alerts, redirect packages to a FedEx retail location for pickup, and more from the palm of your hand - **Download now**.



This tracking update has been requested by:

|  |  |
|---|---|
| **Company name:** | Nelson Mullins |
| **Name:** | Peter Munk |
| **Email:** | peter.munk@nelsonmullins.com |

**FOLLOW FEDEX**

     

✉ Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 9:06 AM CDT 05/20/2022.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above.

Standard transit is the date and time the package is scheduled to be delivered by, based on the selected service, destination and ship date. Limitations and exceptions may apply. Please see the FedEx Service Guide for terms and conditions of service, including the FedEx Money-Back Guarantee, or contact your FedEx Customer Support representative.

© 2022 Federal Express Corporation. The content of this message is protected by copyright and trademark laws under U.S. and international law. Review our privacy policy. All rights reserved.

Thank you for your business.